IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | MC 22-1-H-KLD |
| Petitioner, | |
| vs. | ORDER |
| JAMES PAUL MAGANITO, D.O., | |
| Respondent. | |

The United States of America brings this action on behalf of the United States Department of Veterans Affairs Office of the Inspector General ("VA OIG"). Before the Court are: (1) the United States' petition for summary enforcement of the Inspector General subpoena served on Respondent James Paul Maganito, D.O. (Doc. 1); and (2) Dr. Maganito's motion for leave to file a surreply in opposition to the petition (Doc. 8). For the reasons discussed below, Dr. Maganito's motion is denied and the United States' petition is granted.

## I.    **Background**

On September 21, 2022, pursuant to the Inspector General Act of 1978 ("IGA"), 5 U.S.C. App 3 § 6(a)(4), and the Strengthening Oversight for Veterans Act of 2021 ("SOVA"), 38 U.S.C. § 312(d)(1)(A), the VA OIG issued a subpoena requiring Dr. Maganito appear and testify regarding patient care he provided while

1

employed as Chief of Staff at the Fort Harrison VA Medical Center in Helena. (Doc. 1, ¶¶ 5, 8). The VA OIG issued the subpoena as part of an oversight investigation regarding allegations of abuse, waste, and mismanagement at the Montana Veterans Healthcare System and the Fort Harrison VA Medical Center. (Doc. 2-1, ¶ 5).

The United States claims the VA OIG opened the investigation after receiving complaints that Dr. Maganito provided substandard medical and surgical care to two patients, one of whom was his subordinate employee, and that the VA Medical Center failed to appropriately respond. (Doc. 2-1, ¶ 5). The United States asserts the subpoena was issued "because Dr. Maganito failed to participate in an interview mandated by VA regulation while he was still employed by the VA, and he declined to participate in a voluntary interview after he left his employment with the VA." (Doc. 2, at 2). The United States maintains that Dr. Maganito's participation in the investigation is "critical to the VA OIG's understanding of the root causes of the failure [and] to determine what recommendations should be made to the Secretary to prevent recurrence." (Doc. 2-1, ¶ 7).

On October 13, 2022, Dr. Maganito appeared, with counsel, pursuant to the subpoena but refused to provide testimony on the basis that he was no longer employed by the VA. (Doc. 1, ¶ 9). The United States asserts that subsequent efforts to obtain his compliance have been unsuccessful. (Doc. 1, ¶ 9).

II.   **Discussion**

On December 13, 2022, the Court issued an order directing service of the petition for summary enforcement and attachments, and provided a briefing schedule to the parties. (Doc. 3). Dr. Maganito opposes the petition, arguing the subpoena is unenforceable because it does not meet the Ninth Circuit's three-part judicial inquiry, is unreasonable under the Fourth Amendment, and deprives him of his right to due process by failing to provide sufficient notice of the allegations while exposing him to severe consequences. (Doc. 5, at 5). The United States counters that the subpoena should be enforced because Congress has granted the VA OIG the authority to investigate, the agency adhered to all procedural requirements, and the inquiry into a comprehensive understanding of Dr. Maganito's conduct is relevant and material to the investigation, especially since Dr. Maganito was also the facility's chief of staff. (Docs. 2, at 5; 7, at 1, 5). Additionally, the Unites States asserts Dr. Maganito has not satisfied his burden to show the subpoena is unreasonable, and constitutional procedural due process protections do not apply to the VA OIG's fact-finding investigation. (Doc. 7, at 1).

On February 14, 2023, Dr. Maganito filed a motion for leave to file a surreply, arguing the United States' Reply raised new legal theories, factual claims, arguments, and authority to which he should be allowed to respond. (Doc. 8). The United States did not file a response to this motion.

The Court will address Dr. Maganito's motion for leave to file a surreply before discussing the merits of the United States' petition to enforce the subpoena.

## A. Motion for leave to file surreply

A decision to grant or deny leave to file a surreply is discretionary, and should only be granted "where a valid reason for such additional briefing exists, such as [the opposing party] raises new arguments in its reply brief." *Allen v. Campbell*, No. 4:20-CV-00218-DCN, 2020 WL 6876198, at *7 (D. Idaho Nov. 23, 2020). "Filing of surreplies is highly disfavored, as it typically constitutes a party's improper attempt to have the last word on an issue." *Int'l Inst. of Mgmt. v. Org. for Econ. Coop. & Dev.*, No. 218CV1748JCMGWF, 2019 WL 1299347, at *1 (D. Nev. Mar. 21, 2019) (denying surreply and noting "the proposed brief merely rehashes arguments that the parties raised in prior briefs"). *See also Edwards v. Mondora*, 700 F. App'x 661, 664 (9th Cir. 2017) (affirming the district court's denial of a motion for leave to file a surreply because the movant did not identify in his motion the new arguments allegedly raised or why such arguments would justify granting leave to file a surreply).

Here, Dr. Maganito claims the United States' Reply contains "new theories, factual claims, arguments, and authority" validating his need for additional briefing. The Court does not agree. The United States' Reply cites to facts already in the record and substantively addresses and/or expands on the authorities and

arguments Dr. Maganito raised in his Response. The United States' citations to new legal authority in response to issues raised in Dr. Maganito's brief in opposition do not amount to raising new legal issues or new arguments to justify additional briefing.

Accordingly, Dr. Maganito's motion to file a surreply is denied.

**B. Petition for summary enforcement of subpoena**

The scope of judicial inquiry in an agency subpoena enforcement proceeding is quite narrow. *EEOC v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071, 1076 (9th Cir. 2001) (quoting *EEOC v. Children's Hosp. Med. Ctr.*, 719 F.2d 1426, 1428 (9th Cir. 1983) (en banc), overruled on other grounds as recognized in *Prudential Ins. Co. of Am. v. Lai*, 42 F.3d 1299 (9th Cir. 1994)). Enforcement of an administrative subpoena is proper if: (a) Congress has granted the agency the authority to investigate; (2) the procedural requirements have been followed; and (3) the evidence is relevant and material to the investigation. *EEOC v. Fed. Express Corp.*, 558 F.3d 842, 848 (9th Cir. 2009).

If the agency meets all three parts of this inquiry, "the subpoena should be enforced unless the party being investigated proves the inquiry is unreasonable because it is overbroad or unduly burdensome" under the Fourth Amendment. *EEOC v. Aaron Bros.*, 620 F. Supp. 2d 1102, 1105 (C.D. Cal. 2009); *Karuk Tribe*, 260 F.3d at 1076 ("Put another way, courts must enforce administrative subpoenas

unless the evidence sought by the subpoena is plainly incompetent or irrelevant to any lawful purpose of the agency.") (Internal citations and quotations omitted.).

In opposition to the petition, Dr. Maganito contends the subpoena: (1) exceeds the scope of the VA OIG's investigative authority under the IGA and SOVA because it seeks to investigate allegations of medical malpractice, or "private rights," not "public rights" of general application; (2) is unreasonable under the Fourth Amendment because it is overbroad and unduly burdensome; and (3) deprives him of his right to due process by failing to provide sufficient notice of the allegations while exposing him to severe—potentially criminal— consequences. (Doc. 5, at 2). Dr. Maganito also argues the VA OIG failed to adhere to the procedural requirements under Montana law and that the subpoena is neither relevant nor material to the VA OIG's oversight investigation. (Doc. 5, at 19, 21).

The United States maintains the VA OIG is proceeding squarely within its statutory authority, that Dr. Maganito's testimony is relevant and material to its investigation because it is an integral part of the inspection into the facility's operations, and that Dr. Maganito has not satisfied his burden to show the subpoena is overbroad or unduly burdensome. Additionally, the United States asserts the VA OIG followed all procedural requirements under federal law, which

applies to this case, and moreover, the VA OIG's fact-finding investigation does not trigger additional procedural due process requirements. (*See* Doc. 7).

The Court will address each issue in turn.

### 1.  *Authority to investigate*

The IGA imposes duties and responsibilities on the VA OIG "to conduct, supervise, and coordinate audits and investigations relating to [VA] programs and operations." *Winters Ranch Partnership v. Viadero*, 123 F.3d 327, 333 (5th Cir. 1997) (citing 5 U.S.C. App. 3 § 4(a)(1)). Additionally, the VA OIG is tasked with conducting, supervising, or coordinating "other activities carried out or financed by [the VA] for the purpose of promoting economy and efficiency in the administration of, or preventing or detecting fraud and abuse in [the VA's] programs and operations." 5 U.S.C. App. 3 § 4(a)(3); 38 U.S.C. § 312(a).

To carry out these duties, as relevant here, the IGA authorizes the VA OIG to: (1) "make such investigations and reports relating to the administration of the programs and operations of the [VA] as are, in the judgment of the Inspector General [("IG")], necessary or desirable," and (2) "require by subpoena the production of all information . . . necessary in the performance of the functions assigned by this Act." 5 U.S.C. App. 3 § 6(a)(2) and (4); *Winters Ranch*, 123 F.3d at 333 ("The IG is authorized to require by subpoena from any person or entity, except federal agencies, "the production of all information [. . .] necessary" to its

functions.").[1] In passing SOVA, Congress expressly granted additional authority to the VA OIG to issue subpoenas requiring the "attendance and testimony of witnesses as necessary in the performance of the functions assigned" by the IGA. 38 U.S.C. § 312(d)(1)(A). In sum, "Congress conferred very broad audit, investigatory, and subpoena powers on each Inspector General, as an independent and objective unit of the department or agency, to help promote efficiency and prevent fraud, waste, abuse, and mismanagement in federal government programs." *Winters Ranch*, 123 F.3d at 330. OIG subpoenas are enforceable by order of a district court. 5 U.S.C. App. 3 § 6(a)(4).

First, Dr. Maganito argues the subpoena is unenforceable because SOVA and the IGA "limit the VA OIG's subpoena power to investigating the mismanagement of federal funds" and the United States has failed "to connect the vague allegations of medical malpractice to any broader investigation into systemic, agency-wide bureaucratic mismanagement, fraud, or abuse of federal expenditures." (Doc. 5, at 14–15). The United States counters that nothing in the IGA or SOVA restricts OIG oversight authority to those programs and operations

---

[1] Although not relied on by the United States, 5 U.S.C. App. 3 § 7(a) provides the OIG "may receive and investigate complaints or information from an employee of the establishment concerning the possible existence of an activity constituting a violation of law, rules, or regulations, or mismanagement, gross waste of funds, abuse of authority or a substantial and specific danger to the public health and safety."

that only involve mismanagement of federal funds. The United States maintains the subpoena in this case is necessary to gain a comprehensive understanding of the allegations regarding Dr. Maganito's conduct and determine if a failure of policy and/or privileging practices led to the alleged failures of care, or if Dr. Maganito made independent decisions to act outside of VA policy and/or privileging, resulting in the failures of care. The United States argues that without understanding this distinction, it cannot isolate the "root cause of the potential abuse and mismanagement [or] make policy recommendations aimed at improving care" to veterans. (Doc. 7, at 4; Ginsberg Decl. ¶ 6). This purpose, the United States contends, fits squarely within the OIG's authority granted by Congress.

The Court agrees with the United States. The VA OIG, in its discretion, determined it was "necessary or desirable" to conduct an oversight investigation into the alleged abuse, waste, and mismanagement that led to at least two complaints of failures of care at the VA Medical Center. Because Dr. Maganito's conduct is at the genesis of these allegations, as the United States explains, "only Dr. Maganito knows the information pertaining to his own conduct and decision-making that led to the provision of substandard care." (Doc. 2, at 6). Contrary to Dr. Maganito's argument, the United States plainly connects the individual allegations against Dr. Maganito to a broader investigation into the VA Medical Center, which it claims failed to respond appropriately to the complaints. The VA

OIG's investigation is not simply an effort to uncover an "isolated allegation[] of medical malpractice," as Dr. Maganito contends, but a broader investigation into allegations of systemic mismanagement or abuse at the VA Medical Center that potentially allowed multiple instances of substandard care to occur.

Therefore, the investigation does not seek to vindicate "private rights" affecting "few or select individuals" or allowing for "compensation"; it plainly invokes "public rights," which are generally applicable and "enforced through the administrative process." *See Garner v. Teamsters, Chauffeurs & Helpers Local Union*, 346 U.S. 485, 494 (1953).

Next, Dr. Maganito relies on § 9(a)(2) of the IGA and the District of Columbia Circuit's decision in *Truckers United for Safety v. Mead* to argue that the IGA specifically exempts the VA OIG from having any authority over internal VA operations and programs related to concerns of substandard care or credentialing. *See* 5 U.S.C. App. 3 § 9(a)(2) ("except that there shall not be transferred to an Inspector General under paragraph (2) program operating responsibilities"); *Truckers United*, 329 F.3d at 894 n.3 (D.C. Cir. 2003) (citing *Truckers United,* 251 F.3d 183, 189 (D.C. Cir. 2001) (holding the Department of Transportation ("DOT") IG acted outside the scope of his authority by "involv[ing] himself in a routine agency investigation that was designed to determine whether individual trucking companies were complying with federal motor carrier safety

regulations")). The Court finds *Truckers United* distinguishable to the present case, and concludes the Fifth Circuit's analysis in *Winters Ranch* is persuasive and applicable on these facts.

In *Truckers United*, the D.C. Circuit held the DOT OIG was not authorized to search individual trucking companies' premises and seize their records as part of a routine compliance review that was under the jurisdiction of the Federal Highway Administration Office of Motor Carriers ("OMC"). *Truckers United*, 251 F.3d at 190. The court reasoned that, on the record in that case, "the DOT IG was not engaged in an investigation relating to abuse and mismanagement in the administration of the DOT or an audit of agency enforcement procedures or policies"; "[r]ather, the DOT IG merely lent his search and seizure authority to standard OMC enforcement investigations," which were "central to the basic operations of the agency." *Truckers United*, 251 F.3d at 189.

Conversely, in *Winters Ranch*, the Fifth Circuit clarified that "[i]n order for a transfer of function to occur, the agency would have to relinquish its own performance of that function." 123 F.3d at 334 (holding the district court's interpretation of § 9(a)(2) was "simply incorrect," and a transfer of operating responsibility does not occur just because the OIG emulates a function normally performed by the agency as part of its own independent investigation). *See also Univ. of Med. & Dentistry of New Jersey v. Corrigan*, 347 F.3d 57, 66 (3d Cir.

2003) (finding no basis for concluding that the IG's authority cannot overlap with that of the department).

Here, the purpose of the VA OIG's investigation is not regulatory, as in *Truckers United*, but oversight in nature, as in *Winters Ranch*. Although Dr. Maganito is correct that the IGA "specifically prohibits the OIG from assuming program operating responsibilities," there has been no transfer of operating responsibility in this case because there is no evidence—or even an accusation from Dr. Maganito—that the Veterans Health Administration ("VHA") has "relinquish[ed] its own performance" of reviewing concerns of substandard care or credentialing practices at the VA Medical Center to the OIG. *Winters Ranch*, 123 F.3d at 334. In fact, the lack of any routine agency investigation by the VHA into the allegations of improper credentialing practices that led to substandard medical care by its chief of staff is at the core of the VA OIG's oversight investigation. As the Fifth Circuit concluded in *Winters Ranch*, the Court finds "[t]he record plainly does not support [Dr. Maganito's] inferences that the [OIG's] investigation usurped the agency's program operating responsibilities . . . or was not being conducted for legitimate purposes under the [IGA] as represented by the IG." *Winters Ranch*, 123 F.3d at 335.

Accordingly, the Court finds the subpoena's stated purpose—to fully investigate conduct by its then chief of staff that may have violated VA policies

12

and resulted in substandard care to veterans—falls comfortably within the OIG's broad statutory authority under the IGA and SOVA.

## 2. *Procedural requirements*

SOVA sets forth a number of procedural requirements that the OIG must satisfy before it may issue a subpoena for testimony. First, the witness may not be a current federal employee or any witness as part of any criminal proceeding. 38 U.S.C. § 312(d)(1)(B). Second, the authority to issue a subpoena may not be delegated. 38 U.S.C. § 312(d)(2). Third, the IG must notify the Attorney General of the intent to issue a subpoena so the Department of Justice may object if the subpoena will interfere with an ongoing investigation. 38 U.S.C. § 312(d)(3). Fourth, before requiring testimony by subpoena, to the degree practicable, the IG must notify the witness of his intent to issue the subpoena and provide the witness an opportunity to attend and testify voluntarily. 38 U.S.C. § 312(d)(4). And fifth, to the greatest extent practicable, the IG must travel to a location in proximity to the residence of the witness. 38 U.S.C. § 312(d)(5).

Additionally, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and its associated regulations govern the procedures for disclosing protected health information under federal law. *Lind v. United States*, No. CIV 13-032-TUC-CKJ, 2014 WL 2930486, at *1–2 (D. Ariz. June 30, 2014) ("HIPAA does not create substantive rights that act as a bar on discovery. It merely

establishes procedural mechanisms which have been complied with in the instant case."). *See generally*, 45 C.F.R. pts. 106, 164.

Under HIPAA, "[a] covered entity may disclose protected health information to a health oversight agency for oversight activities authorized by law, including audits; civil, administrative, or criminal investigations; inspections; . . . or other activities necessary for the appropriate oversight of: (i) [t]he health care system." 45 C.F.R. § 164.512(d). The VA OIG is a "health oversight agency" that conducts health oversight activities relating to the health care system. 45 C.F.R. § 164.501(6)(v). *See* 65 Fed. Reg. 84,492 (Dec. 28, 2000).

Dr. Maganito does not take issue with the VA OIG's adherence to any procedural requirements under SOVA or HIPAA, or claim that disclosure is prohibited under federal law. (*See* Doc. 5, at 21–22). Rather, Dr. Maganito argues the subpoena should not be enforced because the VA OIG failed to follow the procedural requirements for parties seeking the disclosure of health care information "in any judicial, legislative, or administrative proceeding" under Montana law. *See* Mont. Code Ann. §§ 50-16-811(1) and 812(1)–(2).[2]

---

[2] Dr. Maganito argues in a footnote that SOVA does not preempt Montana Code Annotated § 50-16-812(1)–(2) because it is not impossible for the VA OIG to comply with both SOVA and Montana law, and the burdens imposed on the VA OIG by Montana's statues are similar in kind to those imposed by SOVA. But the Court notes that in the memorandum opinion that Dr. Maganito relies on for this rule, *United States ex rel Agency for Int'l Dev. v. First Nat. Bank*, 866 F. Supp. 884, 887 (D. Md. 1994), the Maryland district court held that under the Supremacy

In response, the United States argues that federal law, not state law, applies to the issue of disclosure of health care information related to the VA OIG's subpoena, which was issued pursuant to federal law and involves a federally owned and operated facility. First, the United States asserts "in federal question cases, federal privilege law applies." *NLRB v. N. Bay Plumbing, Inc.*, 102 F.3d 1005, 1009 (9th Cir. 1996). Additionally, unlike Montana courts, federal courts do not recognize a physician-patient privilege. *Holtshouser v. U.S.*, No. CV 11-114-

---

Clause, Maryland's privacy statute—which contains a similar certification requirement to the Montana statute at issue here—did not apply to frustrate the enforcement of valid subpoenas issued pursuant to the authority of the IGA. The court reasoned:

> The purpose behind giving the Inspector General subpoena power was to encourage prompt and thorough cooperation with OIG investigations. The Maryland notice provisions serve as an obstacle to the accomplishment of the congressional objective. If the [Office of Inspector General for the Agency for International Development] were forced to comply with [Maryland's Confidential Financial Record Act], it would likewise have to comply with many different state statutes relating to bank records, resulting in substantial frustration to the enforcement of the [IGA]. Because the IG subpoena is valid and complies with the notification requirements under federal law, it is enforceable against First National.

*First Nat. Bank*, 866 F. Supp. at 887 (internal citation omitted). Here, although the United States does not present a preemption argument, the Court finds the Maryland district court's analysis persuasive. The additional procedural requirements under Montana law likely serve as an obstacle to the congressional objectives under the IGA. *See also Nw. Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 925 (7th Cir. 2004) ("The enforcement of federal law might be hamstrung if state-law privileges more stringent than any federal privilege regarding medical records were applicable to all federal cases.").

BLG-RFC, 2013 WL 1498954, at *2 (D. Mont. Apr. 10, 2013). Next, the United

States points out the majority of courts that have addressed the issue of a state

privacy law's impact on federal subpoenas have found that contradictory state law

does not have a reverse preemptive effect on federal privacy law, thereby

concluding that HIPAA procedures govern in cases invoking federal law. *See In re*

*Grand Jury Proceedings*, 450 F. Supp. 2d 115, 118–19 (D. Me. Oct. 3, 2006)

(collecting cases and finding a grand jury subpoena enforceable because "state

medical-privacy law, even if more stringent, [was] inapposite" to the federal

interests).

    The Court finds that based on the substantial volume of precedent discussing

this issue from the Ninth Circuit and elsewhere, the United States is correct. "[A]

subpoena enforcement proceeding [involving a petition issued in the course of an

OIG investigation], 'under common sense and precedents in this circuit and

elsewhere . . . rests soundly in federal law, and federal law of privilege governs any

restrictions on the subpoena's scope.'" *United States v. California Rural Legal*

*Assistance, Inc.*, 722 F.3d 424, 427 (D.C. Cir. 2013) (quoting *Linde Thomson*

*Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.*, 5 F.3d 1508 (D.C.

Cir. 1993) (declining the opportunity to adopt a particular state's privilege law

where the documents in question were sought by a governmental agency with a

nationwide mandate to redress matters of pressing public concern)); *N. Bay*

*Plumbing, Inc.*, 102 F.3d at 1009 (citing Fed. R. Evid. 501) ("[I]nvestigations for federal purposes may not be prevented by matters depending upon state law.").

Accordingly, because the VA OIG is conducting health oversight activities in its capacity as a health oversight agency, federal law permits the disclosure of protected health information for this purpose and Montana's additional statutory requirements do not apply to frustrate the subpoena's enforceability.

### 3. *Relevant and material*

In the context of administrative subpoenas, courts interpret relevance broadly, generally "defer[ring] to the agency's appraisal of relevancy, which must be accepted so long as it is not obviously wrong," *McVane v. FDIC (In re McVane)*, 44 F.3d 1127, 1135 (2d Cir. 1995), or "plainly incompetent or irrelevant to any lawful purpose of the agency." *EEOC v. Fed. Express Corp.*, 558 F.3d 842, 854 (9th Cir. 2009). "An affidavit from a government official is sufficient to establish a prima facie showing that these requirements have been met." *In re McVane*, 44 F.3d at 1136 (citing *United States v. Stuart*, 489 U.S. 353, 360 (1989); *United States v. Comley*, 890 F.2d 539, 541–42 (1st Cir. 1989)).

Dr. Maganito's argument that the subpoena is not relevant or material relies heavily on the Second Circuit's holding in *In re McVane*, a case in which the Federal Deposit Insurance Corporation ("FDIC") subpoenaed personal financial information from former bank directors of a failed bank, who were under

investigation, as well as from their spouses and family members. *In re McVane*, 44
F.3d at 1131. The circuit court vacated the lower court's order insofar as it
enforced the portions of subpoenas that sought personal information from the
directors' families, calling for "enhanced scrutiny" of the agency's request to
obtain personal financial records from third parties with no connection to the
investigation beyond their familial relationship with the directors. *In re McVane*,
44 F.3d at 1138. However, as relevant here, the Second Circuit clarified that the
directors "have not objected to turning over records in their possession that pertain
to their roles as former directors of [the bank]. It is the requests for personal
information not related to their capacities as directors, and for the personal
financial records of their families, to which they object." *In re McVane*, 44 F.3d at
1133–34.

Conversely, in this case, Dr. Maganito objects to requests for information
related to decisions he made in his role as the VA Medical Center Chief of Staff.
The subpoena seeks information over which Dr. Maganito has direct knowledge,
and which is an integral part of the inspection. Thus, *In re McVane* is both
distinguishable on these facts and its narrow holding does not undermine the
government's showing of relevancy in this case.

The United States asserts that Dr. Maganito's testimony is "critical to the
VA OIG's understanding of the root causes of the failure to determine what

recommendations should be made to the Secretary to prevent recurrence." (Doc. 2-1, ¶ 7). The United States argues Dr. Maganito's testimony is relevant because only he can inform the VA OIG's investigation about his decision-making process related to the conduct at the heart of the investigation.

Dr. Maganito counters this reasoning is insufficient because, "the agency must also make some showing of need for the material sought beyond its mere relevance to a proper investigation." (*See* Doc. 5, at 19). But, while Dr. Maganito again cites to *In re McVane* for this proposition, he omits the qualifying language the court used to make clear that the heightened scrutiny only applied to subpoenas issued for personal records of parties not involved in the investigation. The administrative subpoena at issue in this case is directed at Dr. Maganito, who is directly involved in and has knowledge of the issues at the heart of the OIG investigation. Thus, *In re McVane*'s heightened scrutiny standard does not apply.[3]

Accordingly, because the Court finds the United States has established Dr. Maganito's testimony is neither incompetent nor irrelevant to the allegations of abuse and mismanagement in the administration of programs and services at the

---

[3] To the extent that Dr. Maganito argues he should be afforded a heightened expectation of privacy as a third party individual no longer employed by the VA, this argument fails under SOVA, which plainly does not apply to current federal employees. *See* 38 U.S.C. § 312(d)(1)(B) (providing that the subpoenaed witness may not be a current federal employee or a witness in a criminal proceeding).

VA Medical Center, the information sought is both relevant and material to the OIG's investigation.

### 4. Reasonableness

As the United States has established that the subpoena is otherwise valid, it should be enforced unless Dr. Maganito "proves the inquiry is unreasonable because it is overbroad or unduly burdensome." *United States v. Golden Valley Elec. Ass'n*, 689 F.3d 1108, 1115 (9th Cir. 2012). A subpoena "may not be so broad as to be in the nature of a fishing expedition." *Fed. Hous. Fin. Agency v. SFR Invs. Pool 1, LLC*, No. 2:17-cv-0914-GMN-PAL, 2018 Dist. LEXIS 52388, at *20 (D. Nev. Mar. 27, 2018) (stating that "[t]o resist enforcement, the subpoenaed party must specifically identify how the subpoena constitutes a fishing expedition"). A subpoena causes an undue burden if it is unduly disruptive or poses a severe hindrance. *Consumer Fin. Prot. Bureau v. Future Income Payments, LLC*, 252 F. Supp. 3d 961, 970 (C.D. Cal 2017), order vacated in part by No. 8:17-CV-00303, 2018 WL 7502720 (C.D. Cal Dec. 18, 2018); *Fed. Trade Comm'n v. Texaco, Inc.*, 555 F.2d 862, 882 (D.C. Dist. 1977) ("Some burden on subpoenaed parties is to be expected and is necessary in furtherance of the agency's legitimate inquiry and the public interest.").

In this case, Dr. Maganito has the burden of demonstrating that the subpoena is unreasonable. *Children's Hosp. Med. Ctr. of N. Cal.*, 719 F.2d at 1428 (noting

that the party opposing enforcement bears the burden of showing that compliance would impose an undue burden). "The standard for showing that a request is unduly burdensome . . . is a high one." *U.S. Commodity Futures Trading Comm'n v. Ekasala*, 62 F. Supp. 3d 88, 94 (D.C. Dist. 2014).

Dr. Maganito sets forth the following arguments as to why the subpoena in this case is unreasonable: (1) Dr. Maganito has limited information of the complaints; (2) the subpoena subjects Dr. Maganito to severe consequences if he provides false statements or commits perjury without offering him specific information related to the patient complaints; (3) as an individual, Dr. Maganito has a heightened expectation of privacy; (4) the information sought implicates confidential health care information; and (5) the investigation is tainted by a conflict of interest because Dr. Maganito attempted to file a formal complaint against the VA OIG inspector overseeing the investigation. (Doc. 5, at 22–26). Each of these arguments is without merit.

The Court has previously addressed several of Dr. Maganito's stated contentions. First, under SOVA, Dr. Maganito does not have a heightened expectation of privacy solely because he is an individual, and not a current federal employee—the statute expressly exempts current federal employees. *See* note 4, *supra*. Second, the Court has determined that disclosure of the protected health

21

information related to the VA OIG's oversight inquiry is permissible under federal law. *See* § II(B)(2), *supra*.

Next, Dr. Maganito's limited information and severe consequences arguments are unavailing. In *Ekasala*, the D.C. district court rejected the respondent's overbreadth argument that a subpoena's "lack of information and explanation as to its nature provide[ing] [him] with no guidance or direction on whether or not participation [and] could serve to self-incriminate" were bases to quash the subpoena. *Ekasala*, 62 F. Supp. 3d at 94. The court reasoned that "[i]n accordance with the rights guaranteed by the Constitution" the respondent "may refuse to provide information that may tend to incriminate him by invoking the Fifth Amendment." *Ekasala*, 62 F. Supp. 3d at 94. The same is true here. As the attachment to the subpoena advises, individuals directed to provide testimony pursuant to a VA OIG subpoena retain their constitutional right against self-incrimination. (Doc. 2-1, at 14). Thus, because the subpoena has been validly issued as part of a legitimate VA OIG oversight investigation, Dr. Maganito cannot avoid its enforcement on these grounds. Consistent with his rights under the Fifth Amendment, Dr. Maganito may decline to answer incriminating questions, and if he does not recall an answer to a question, he may so state.

Finally, to the extent that Dr. Maganito argues the VA OIG investigation was initiated in bad faith because it is tainted by a conflict of interest between the

VA OIG inspector overseeing the investigation and himself, the Court finds this accusation unsupported by the record and insufficient to establish the subpoena request is unreasonable under the Fourth Amendment.

Dr. Maganito has the burden to show an abuse of process, or that the subpoena was issued in bad faith for an improper purpose. *FDIC v. Garner*, 126 F.3d 1138, 1146 (9th Cir. 1997). "Specificity is an integral part of a respondent's heavy burden to show abuse of process or institutionalized lack of good faith." *EEOC v. Bashas', Inc.*, 828 F. Supp. 2d 1056, 1079 (D. Ariz. 2011), *vacated and remanded on other grounds*, 585 F. App'x 325 (9th Cir. 2014) (citing *Garner*, 126 F.3d at 1146) (noting that "however a 'heavy burden' is defined, surely it demands more than conjecture and innuendo").

As evidence of his bad faith claim, Dr. Maganito provides an affidavit in which he describes his attempt to file a formal complaint against Inspector Glenn Schubert with the VA OIG. (Doc. 5-1, ¶ 8). Dr. Maganito's testimony implies there was something suspicious about the VA OIG's response to his concerns, stating "it seemed questionable that there was no formal process for [a] complaint regarding an OIG Inspector." (Doc. 5-1, ¶ 9). However, Dr. Maganito's affidavit contains no specifics—it neither reveals the basis for his complaint against Inspector Schubert nor explains how his concerns created a conflict of interest relevant to the agency's decision to issue the subpoena. (*See* Doc. 5-1, ¶¶ 8–12). Rather, Dr. Maganito asks

this Court to find that the subpoena must have been issued in bad faith for an unspecified improper purpose solely because Inspector Schubert was one of six VA OIG staff to participate in the meeting where Dr. Maganito was scheduled to provide testimony. The Court is not convinced. Thus, on this record, Dr. Maganito has not met his burden of showing abuse of process.

Accordingly, the Court finds that Dr. Maganito has failed to show the subpoena is "overbroad or unduly burdensome" under the Fourth Amendment.

### 5.  Due process

Lastly, Dr. Maganito asserts that, as applied to him, SOVA violates the Fifth Amendment's procedural due process requirements because the subpoena does not provide him sufficient notice of the allegations underlying the investigation, while exposing him to severe consequences. (Doc. 5, at 26). The United States argues the procedural due process protections Dr. Maganito claim are warranted do not apply to the VA OIG's general fact-finding investigation because the VA OIG has no adjudicative authority. The Court agrees with the United States.

Procedural due process under the Fifth Amendment requires that individuals receive notice and an opportunity to be heard before the government can deprive them of a property or liberty interest. U.S. Const. amend. V; *Matthews v. Eldridge*, 424 U.S. 319, 348–49 (1976); *Cox v. Yellowstone Cnty.*, 795 F. Supp. 2d 1128, 1136 (D. Mont. 2011). But "when governmental action does not partake of an

adjudication, as for example, when a general fact-finding investigation is being

conducted, it is not necessary that the full panoply of judicial procedures be used."

*Hannah v. Larche*, 363 U.S. 420, 442–43 (1960).

In *Hannah*, the Supreme Court held that voting registrars, whose conduct

was under investigation by the Commission on Civil Rights, were not entitled, "by

virtue of the Due Process Clause, to know the specific charges that are being

investigated, as well as the identity of the complainants." *Hannah*, 363 U.S. at 441,

453. The Court noted that, although respondents were given notice of the general

nature of the inquiry, "[i]n the vast majority of instances, congressional committees

have not given witnesses detailed notice," and reasoned that if investigative

hearings were transformed into trial-like proceedings, "[f]act-finding agencies

without any power to adjudicate would be diverted from their legitimate duties and

would be plagued by the injection of collateral issues that would make the

investigation interminable." *Hannah*, 363 U.S. at 443–45.

In *Clifford v. Shoultz*, the Ninth Circuit relied on and reiterated much of the

Supreme Court's reasoning from *Hannah* in the context of a Department of

Defense screening board's preliminary investigative procedure of Shoultz's

continued eligibility for a security clearance. *Clifford v. Shoultz*, 413 F.2d 868, 873

(9th Cir. 1969). In holding Shoultz's rights had not been infringed, the Ninth

Circuit quoted favorably the following passage from *Hannah*:

25

> It is probably sufficient merely to indicate that the rights claimed
> by respondents are normally associated only with adjudicatory
> proceedings, and that since the Commission does not adjudicate it
> need not be bound by adjudicatory procedures. Yet, the respondents
> contend and the court below implied, that such procedures are
> required since the Commission's proceedings might irreparably
> harm those being investigated [ . . . ]. There is nothing in the record
> to indicate that such will be the case [ . . . ]. However, even if such
> collateral consequences were to flow from the Commission's
> investigations, they would not be the results of any affirmative
> determinations made by the Commission, and they would not
> affect the legitimacy of the Commission's investigative function.

*Clifford*, 413 F.2d at 874 (quoting *Hannah*, 363 U.S. at 442–43).

The same is true here. Dr. Maganito is not entitled to detailed notice of the claims underlying the VA OIG investigation. Additionally, his concerns about collateral consequences are speculative, at best, and adequately protected by his Fifth Amendment right against self-incrimination, as discussed under § II(B)(4), *supra*. Any subsequent civil, administrative, or criminal proceeding that might be brought against Dr. Maganito would be initiated by a separate, adjudicative entity, and would not be the result of any determinations made by the VA OIG. Thus, Dr. Maganito's argument is not supported by the vast body of law in the Ninth Circuit and elsewhere discussing the level of procedural due process protections required in the context of administrative subpoenas by investigative bodies operating under federal law.

Accordingly, SOVA's procedural requirements regarding notice as applied to Dr. Maganito do not violate the Constitution.

### III.   **Conclusion**

For the reasons stated above,

IT IS ORDERED that Respondent's Motion for Leave to File a Sur-reply

(Doc. 8) is DENIED and the Government's Petition for Summary Enforcement of

Inspector General Subpoena (Doc. 1) is GRANTED.

DATED this 26th day of April, 2023.

Kathleen L. DeSoto
United States Magistrate Judge

27